IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NER TAMID CONGREGATION OF NORTH TOWN, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 1261 |
| vs. | ) ) ) | Magistrate Judge Jeffrey Cole |
| IGOR KRIVORUCHKO, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

In 2007, real estate developer, Igor Krivoruchko, contracted with Ner Tamid Congregation

of North Town, an Illinois not-for-profit corporation (*Amended Answer*, ¶2), to purchase property

Ner Tamid owned on Rosemont Avenue in Chicago. After postponing the closing once, Mr.

Krivoruchko refused to go forward with the deal because he said he could not obtain the kind of

financing he hoped to get. The purchase contract contained no financing contingency clause,

because, believing he was "creditworthy" and had not had problems in the past with the lender with

which he was dealing, Mr. Krivoruchko did not desire one.

Ner Tamid sued for breach of contract. Mr. Krivoruchko, after conceding that he was a

resident and citizen of Florida in three separate filings, contended that he was actually a resident and

citizen of Illinois and moved to dismiss for want of jurisdiction. That motion was denied. *See Ner

Tamid Congregation of North Town v. Krivoruchko*, _F.Supp.2d_, 2009 WL 1543887 (N.D.Ill.

2009). Ner Tamid has now moved for partial summary judgment on liability and the affirmative

defenses of impossibility and impracticability, which are based on what Mr. Krivoruchko claims was the "unanticipated" and "unforeseeable"downturn in the economy, which precluded him from obtaining the precise financing he wanted. The motion argues that the only real issue in the case is the amount of damages, which it concedes should be left for another day. Summary judgment, if otherwise proper, can be granted in a case such as this. *See e.g., Columbian Nat. Title Ins. Co. v. Township Title Services, Inc.* 659 F.Supp. 796, 803 (D.Kan.1987).

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1(a)(3) requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," L. R. 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." L. R. 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. District courts are "'entitled to expect strict compliance'" with Rule 56.1, and they do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the Rule's instructions. *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Uniform Services, Inc.,* 368 F.3d 809, 817 (7th Cir.2004).

# I.

## FACTUAL BACKGROUND

On May 3, 2007, Mr. Krivoruchko and Ner Tamid entered into a written agreement whereby Mr. Krivoruchko agreed to purchase the Rosemont Avenue property for $3,825,000. Ner Tamid would give Mr. Krivoruchko a $340,000 credit at the closing, making the net purchase price under the agreement $3,485,000. There was no mortgage contingency clause in the agreement. (*Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts* ("*Pl.St.*"), ¶¶ 9-12; Ex. B).

Originally, the closing was to be on or before October 31, 2007, but Mr. Krivoruchko sought an extension. On October 23rd, his counsel wrote to Ner Tamid's counsel "strongly reinforc[ing Mr. Krivoruchko's] desire to purchase the subject property [,]... to punctuate that he is very sympathetic to the seller's concerns," and to stress that the "request for an extension is in no way a reflection of my client's inability to procure financing, but is instead the nature of the financing he is procuring." (*Pl.St.*, ¶ 31; Ex. D). He wrote off the delay to the lender's heightened scrutiny over the type of loan he was seeking, which was combination acquisition-construction financing. (*Id.*). He explained:

> with the nature of these types of financing projects, lenders tend to require architectural drawings/renderings, zoning confirmation, contracts for the sale of prospective units, contracts with contractors and subcontractors, and a slew of other miscellaneous items. My client indicated that he has closed over 250 units over the last year, many of which have been with this firm, both purchases and sales, so my clients[sic] are confident that the closing will take place, but the nature of the financing necessitates the lenders' meticulous review.

(*Id.*). He suggested Ner Tamid contact either First Midwest Bank or First DuPage Bank in order to "put the seller at ease, and allay any of the seller's anxieties, of the purchaser's good faith to finalize the financing in this matter." (*Id.*). Ner Tamid thus agreed to extend the closing date to January 15, 2008. That modification also called for Mr. Krivoruchko to deposit an additional $50,000 in escrow,

3

bringing the total to $150,000. (*Pl.St.*, ¶ ¶ 14; Ex. B).

The letter of October 23rd was less than forthcoming. In opposing summary judgment, Mr. Krivoruchko has submitted the affidavit of Dean Lawrence, vice president of the commercial real estate division of First DuPage Bank. (*Krivoruchko's L.R. 56.1(b)(3)(A) and (B) Response*; Ex. A). Mr. Lawrence explained that beginning in the summer of 2007 – about the time Mr. Krivoruchko approached him with the Ner Tamid deal – the lending market in general began to reject loans that previously would have been accepted. (Ex. A, ¶¶ 5, 11). The "primary driver of this decline in loan acceptance was the market, not the individual credit-worthiness of the applicants." (¶5). As a result, "[i]n or about mid-2007, First DuPage funded its last commercial real estate development loan – commonly known as "build-and-sell loans" – which was the type of loan Mr. Krivoruchko wanted. (¶6). He explained that this was the reason Mr. Krivoruchko could not get financing – not his creditworthiness or the proposed transaction. (¶8).

Mr. Lawrence's affidavit concludes that the "depth of the real estate recession that began in mid-2007 was not foreseen or foreseeable in the summer of 2007...." (¶11). Thus, Mr. Krivoruchko argues that his failure to close was through no fault of his own. But it is worth noting that the claimed moratorium on the type of loan he sought occurred perhaps three or four months before the October 23rd letter that lulled Ner Tamid into believing that nothing out of the ordinary was going on with Mr. Krivoruchko's financing. Moreover Mr. Krivoruchko's affidavit admits that between the Summer of 2007 and the end of 2007 he "became increasingly aware" that his bank and other lending institutions were rejecting loans they previously would have accepted. (Response, Ex. B at ¶ 4). Yet he did nothing to alert Ner Tamid that there might be difficulties.

First Midwest Bank was not quite so averse to making real estate loans as was First DuPage

Bank, and it offered Mr. Krivoruchko a partial financing package on October 30, 2007: the bank would loan $2.085 million, with Mr. Krivoruchko contributing $1.74 million toward the purchase. Additional releases of funds for construction would be made contingent on the presale of condominium and commercial space. The total package would amount to $9.86 million. (*Pl.St.*, Ex. E at K000118-000121). The offer apparently failed to entice Mr. Krivoruchko.[1]

On November 29, 2007, Mr. Krivoruchko's attorney wrote a terse letter to Ner Tamid's counsel stating that Mr. Krivoruchko requested that he make the "following proposition for consideration":

> Would the seller be willing to carry a second mortgage on the property in the amount of $650,000, to balloon in 24 months, at an annual rate of 7%?

> This is not a counter-offer, but merely a suggestion as we move forward with our financing.

> Please do contact me at your earliest convenience.

(*Pl.St.*, ¶ 28; Ex. C at K000110).

Krivoruchko's counsel reiterated the suggestion for Ner Tamid's consideration made on December 13th. The letter again asked if Ner Tamid "would be willing" to carry a second mortgage

---

[1] Mr. Krivoruchko's brief in response to Ner Tamid's motion for summary judgment points out that the letter was not a commitment on First Midwest's part but, as First Midwest phrased it, "a preliminary and tentative proposal." (*Pl.St.*, Ex. E at K000121). The brief contends that he signed this offer, but First Midwest did not make the loan. (*Response to Plaintiff's Motion for Summary Judgment*, at 9). But no evidence is provided to support the claim either in Mr. Krivoruchko's own affidavit, which is tellingly silent on this point, or in an affidavit from First Midwest. Moreover, it is not even reflected in his Local Rule 56 statement of facts. In short, the claim is unsupported and cannot be considered. *See Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008)(mere disagreement with the movant's asserted facts is inadequate to defeat summary judgment if made without reference to specific supporting material); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008)(factual assertions must be supported with admissible evidence). Quite apart from the requirements of Rule 56, unsupported statements in briefs are not evidence and do not count. *See United States v. Stevens*, 500 F.3d 625, 628 -629 (7th Cir. 2007); *Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002).

of $650,000 on the property as this "will certain [sic] assist the purchaser in finalizing the transaction." Like its predecessor, the letter stressed that "[t]his is not a counter-offer, but merely a suggestion as we move forward with our financing." (*Pl.St.*, Ex. C at K000108).

Ner Tamid's counsel responded on January 9, 2008, rejecting the suggestion:

> I understand that your client Mr. Krivoruchko is presently unable to proceed to closing due to lack of sufficient financing. It is thus anticipated that he will be in breach of the contract on the extended contract closing date of January 15, 2008. Accordingly, on behalf of my client, the contract is hereby declared in default as of January 15, 2008, based on Mr. Krivoruchko's inability to provide closing funds as per the contract.

(*Pl.St.*, ¶ 29; Ex. C at K000107). Ner Tamid reminded Mr. Krivoruchko that there was no financing contingency clause in their agreement and indicated that it would be willing to close no later than January 31st, if Mr. Krivoruchko was able to live up to his contractual obligations by then. (*Id.*).

Mr. Krivoruchko failed to close on the property. His attorney informed Ner Tamid's attorney that he would be unable to do so because he had been unable to obtain financing. (*Pl.St.*, ¶¶ 13-17). Ner Tamid put the Rosemont Avenue property back on the market and sued Mr. Krivoruchko for breach of contract on March 3, 2008. It listed the property for $3.8 million – the same price it had offered the property for sale before its contract with Mr. Krivoruchko. (*Pl.St.*, ¶ 34). Mr. Krivoruchko has retained an expert witness who performed appraisals on the property in October 2007 and January 2008. Each time, he valued it at $3.825 million. (*Krivoruchko's Local Rule 56.1(b)(3)(A) and (B) Response*, ¶ 22; Ex. C). Ner Tamid received an offer for $2 million in May of 2008, but rejected it as too low, saying "they would have to make a higher offer to get a response." (*Pl.St.*, ¶ 35; Ex. F, at 21-22). The offeror declined, explaining that he already had a contract for another building and that was as high as he could go. (*Id.*).

6

While admitting essentially all of this, Mr. Krivoruchko advances two affirmative defenses: 1) Ner Tamid failed to mitigate its damages because it did not accept the other offer, and it did not negotiate alternate (lower) terms under which Mr. Krivoruchko could go forward with the purchase – what those terms should have been is not specified, and there is no claim that Mr. Krivoruchko was in a position to have accepted a lower offer;[2] and 2) Mr. Krivoruchko's performance under the agreement should be excused under the doctrine of impossibility due to what he contends was the "unforeseen" and "unforeseeable" collapse in the real estate market in the summer of 2007, which prevented him from getting a loan.

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, a court must construe all facts and reasonable inferences in favor of the nonmoving party. But that favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.2008). The nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [it] must come forward with specific facts showing that there is a

---

[2] Mr. Krivoruchko has offered no evidence that he had sufficient cash to purchase the property at any price, and his claim and his proof are that the kind of financing that he was willing to accept had dried up in the summer of 2007. *See* Lawrence Affidavit, Ex. A to Defendant's Response to Rule 56 Statement and Krivoruchko Affidavit, Ex. B to Defendant's Response to Rule 56 Statement.

genuine issue for trial." *Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 628 (7th Cir.2006) (brackets in original)(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

Where the nonmoving party bears the burden of proof at trial – as Mr. Krivoruchko does on his affirmative defenses, *Taylor v. Sturgell,* 128 S.Ct. 2161, 2179 -2180 (2008) – he must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996)("If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir.2007). And, of course, a court can enter partial summary judgment. *See Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc.*, 313 F.3d 385, 391 (7th Cir. 2002).

### B.
### The "Duty" To Mitigate Damages

### 1.

Under Illinois law, mitigation of damages is an affirmative defense on which the defendant bears the burden of proof. *Ellis v. Sheahan,* 412 F.3d 754, 756 (7th Cir. 2005); *Cates v. Morgan Portable Bldg. Corp.,* 780 F.2d 683, 688 (7th Cir. 1985); *Mikus v. Norfolk and Western Ry. Co.*, 312 Ill.App.3d 11, 32, 726 N.E.2d 95, 112 (1st Dist. 2000). While the defense is often couched in the language of obligation, the formulation is somewhat misleading, because the plaintiff incurs no

liability for his failure to act. Rather, the amount of loss that could reasonably have been avoided by stopping performance or making substitute arrangements is simply subtracted from the amount that would otherwise have been recoverable as damages. *See McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358, 169 N.E. 605, 614 (1930)(Cardozo, C.J., concurring); *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill.App.3d 285, 293, 695 N.E.2d 503, 509 (1st Dist. 1998); Restatement (Second) of Contracts § 350, Comment b. (1981).

To sustain the defense the defendant must demonstrate that the plaintiff failed to "'exercise reasonable diligence and ordinary care in attempting to minimize the damages after injury has been inflicted.'" The injured party is not, however, required to take steps that involve "undue risk or burden." *East St. Louis School Dist. No. 189 v. Hayes*, 237 Ill.App.3d 638, 644, 604 N.E.2d 557, 562 (5th Dist. 1992); Restatement (Second) of Contracts § 350 (1981); *St. George Chicago*, 296 Ill.App.3d at 293, 695 N.E.2d at 509. In short, failure to mitigate is not a defense to liability; it concerns only the amount of recoverable damages, not the right to recover damages.

To the extent Ner Tamid's motion is about *liability* – and it says that it is – mitigation is a matter for another day. That being said, the current record allows certain factors relating to the claim of failure to mitigate to be eliminated from consideration. First, there is the letter of November 29th in which Mr. Krivoruchko's attorney asked whether Ner Tamid might be amenable to providing $650,000 (or 17%) in financing. Whatever else may be said of this letter, it did not trigger a "duty" on the party of Ner Tamid to mitigate. In Illinois, as elsewhere, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain. *Business Systems Engineering, Inc. v. International Business Machines Corp.*, 547 F.3d 882, 888 (7th Cir. 2008). To be an offer, it must

induce a reasonable belief in the recipient that he can, by accepting, bind the offeror. *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.,* 58 F.3d 1227, 1229 (7th Cir. 1995). Mr. Krivoruchko's letter was emphatic that he was not making a "counter-offer, but merely a suggestion as [Mr. Krivoruchko] move[d] forward with [his] financing." And the letter came shortly after a previous letter informing Ner Tamid that financing was indeed proceeding apace.

Nimbly changing positions, Mr. Krivoruchko's response to the motion for summary judgment now insists that he "proposed an alternative transaction that would involve a relatively small percentage of seller financing" – actually 17% – and that by not agreeing to this "alternative proposal," Ner Tamid failed to mitigate its damages. (*Response to Plaintiff's Motion for Summary Judgment*, at 4-5).[3]

The November 29th letter did not constitute a breach, but merely made a suggestion that Ner Tamid was free to reject. Indeed, as the letter stressed, it was not a counter-offer. It informed Ner Tamid that attempts to procure financing were proceeding apace, and it came shortly after the letter seeking to allay any fears Ner Tamid might have about the deal not closing. According to the written assurance provided by Mr. Krivoruchko and his counsel, there was nothing out of the ordinary going on with Mr. Krivoruchko's quest for financing. Consequently, the November 29th letter was not a breach and did not require Ner Tamid to mitigate damages.[4] Consequently, since a duty to mitigate

---

[3] Seventeen percent may be a small amount to a bank or to Mr. Krivoruchko, but it would not be to a not-for-profit religious institution that was not in the business of financing real estate developers and it most certainly would not be a small percentage of seller financing in late 2007, when Mr. Krivoruchko made his suggestion to Ner Tamid. By then, the depth of the recession was clear to everyone.

[4] Although Mr. Krivoruchko does not quite say it, reduced to its essentials, his mitigation theory is based on a rather disturbing (and analytically incorrect) proposition: Ner Tamid should have prophesized that Mr. Krivoruchko would not close the deal and thus should have attempted to negotiate terms more favorable to Krivoruchko. This transmutes the doctrine of *caveat emptor* into *caveat venditor*. What a strange and
(continued...)

damages does not arise until the plaintiff learns of the other party's breach of the underlying contract, Ner Tamid was not required to take any action to reduce damages. *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1092 (7th Cir. 1985); *Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1448 (3rd Cir.1996); *Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995).

Of course, there came a time when it became clear that Mr. Krivoruchko was not going to close the deal. It is his contention that when that occurred, Ner Tamid's duty to mitigate mandated that it either underwrite the purchase by itself providing at least 17% of the financing – the amount that he thinks necessary is not spelled out in his affidavit – or that it sell the property to him at a reduced price effectively dictated by him.[5] What that price should have been he also does not say. If the absence of specificity does not doom the mitigation argument, the fact that Mr. Krivoruchko's summary judgment submission makes no showing that he was financially able to have accepted any reasonably reduced offer does. It must be remembered, that Mr. Krivoruchko turned down a financing package that would have required him to contribute less than $2 million, and his proof is that the kind of financing he wanted was unavailable beginning in the summer of 2007. Hence, even if Mr. Krivoruchko's theory were otherwise valid, Ner Tamid's claimed failure to have mitigated damages by not financing the deal or selling at some reduced price would not have changed things

---

[4](...continued)
curious inversion. Had Ner Tamid offered to do what the November 29th letter suggested, Ner Tamid "'might have been exposed... to the charge of having abandoned the first contract.'" *Alton Mercantile Co. v. Booth Packing Co. of Baltimore, Md.*, 103 Kan. 412, 173 P. 1074, 1075 (1918).

[5] Mr. Krivoruchko does not provide any solid figures as to what his proposed offset might be. The "suggestion" letter asked whether Ner Tamid might carry a mortgage of $650,000. Mr. Krivoruchko's response brief proposes a mortgage of $685,000. (*Response to Plaintiff's Motion for Summary Judgment*, at 6). It is Mr. Krivoruchko's burden to *prove* failure to mitigate, not offer various figures for speculation.

in the slightest and thus cannot result in a reduction of damages, whatever they may be.

The theory of mitigation advanced by Mr. Krivoruchko, namely that Ner Tamid was required after his breach to renegotiate the contract and agree to terms more favorable to him was rejected almost a century ago by the Illinois Supreme Court in *Coppola v. Marden, Orth & Hastings Co.*, 282 Ill. 281, 285 (1917). There, the plaintiff contracted to purchase olive oil from the defendant on credit. When the time came for delivery, the market had changed and the defendant refused to sell except upon payment in cash. The plaintiff refused to abide by this unilateral change in the agreement and instead bought the oil at a substantially greater price than the $1.30 per gallon specified in the contract. The plaintiff recovered a judgment of $1,537.50, which was the difference in the contract price and the amount the plaintiff paid for the oil.

On appeal, the Illinois Supreme Court held that when a seller who agrees to deliver on credit declines to abide by his promise to extend credit, the buyer is not limited in his damages to the loss he would have sustained if he had submitted to the demand for cash. Speaking in purposefully broad terms, the Illinois Supreme Court said:

> It is a sound and wholesome rule which makes it the duty of one damaged by the unlawful act of another to use reasonable diligence to prevent or lessen the damage; but to construe that rule to apply to a case of this character would be to impose a burden on the vendee of doing what the contract relieved him from, in order that the guilty party might be saved from the full consequences of his willful wrongdoing. We believe it to be sound both in law and morals that commercial contracts of a lawful character, knowingly and understandingly entered into, are binding obligations on both parties to them, and, as said in substance in *Illinois Central R. Co. v. Cobb, Christy & Co.*, 64 Ill. 128, it comes with an ill grace from a party who has refused to perform the agreement to demand that the other party, who has not been at fault, should do something contrary to the terms of the contract to mitigate or lessen the damages resulting from the refusal to perform the contract.

The instant case presents the converse of *Coppola*. There, the seller sought to require the purchaser to pay in cash after agreeing that the transaction would be on credit. Here, it is the purchaser who seeks to require the seller to advance credit after agreeing that he would pay in cash. There is no principled distinction between the situation in *Coppola* and the situation in this case, and *Coppola* compels rejection of Mr. Krivoruchko's mitigation thesis. More recently, *American Fidelity Fire Ins. Co. v. General Ry. Signal Co.*, 184 Ill.App.3d 601, 614, 540 N.E.2d 557, 566 (1st Dist. 1989), relied on *Coppola* in holding that "[u]pon [defendant's] breach of contract, [plaintiff] was not required to accept [defendant's] offer to perform the original contract on new or modified terms and [defendant] cannot now limit [plaintiff's] damages to only those which would have resulted if its offer had been accepted." This is the position taken by most courts throughout the United States. *See* 11 Joseph M. Perillo, Corbin on Contracts, §57.15 (2005); 5 A. Corbin, Corbin On Contracts § 1043 at 274 (2d ed. 1964); McCormick on Damages, §39 (1935); *Publicker Chemical Corp. v. Belcher Oil Co.,* 792 F.2d 482, 488 (5th Cir. 1986); *Franconia Associates v. United States*, 61 Fed.Cl. 718, 741 (2004).

Further, Mr. Krivoruchko's theory of mitigation is contrary to the basic principles that a claim of failure to mitigate damages is not a basis for a hypercritical examination of a plaintiff's conduct, *Amalgamated Bank of Chicago v. Kalmus and Associates, Inc.*, 318 Ill.App.3d 648, 660, 741 N.E.2d 107, 108 (1st Dist. 2000), and a plaintiff need only use *reasonable* efforts in minimizing his damages; undue efforts or expense are not required. *Amalgamated Bank of Chicago,* 318 Ill.App.3d at 661, 741 N.E.2d at 108; *supra*, at 9. Requiring that Ner Tamid, a not-for-profit religious organization, finance 17% or perhaps more of Mr. Krivoruchko's purchase of the property would not be reasonable – especially given the economic situation in late 2007 when the suggestion

was made and in early 2008 when the breach of contract occurred.  It is especially unreasonable for Mr. Krivoruchko to insist that Ner Tamid was required to undertake a risk that he argues banks in the business of financing real estate deals were unwilling to accept.

## 2.

We come then to the argument regarding the $2 million offer Ner Tamid received on the property in May 2008, shortly after Mr. Krivoruchko breached his contract with Ner Tamid. Although Ner Tamid insisted that a higher offer would have to be made before it would respond, (*Pl.St.*, ¶ 35; Ex. F, at 21-22), the offeror declined, explaining that he already had a contract for another building at that price and that was as high as he could go.  (*Id.*).  While the offeror liked the Ner Tamid location better, it ultimately liked the lower price more.  (*Pl.St.*, Ex. F, at 22).

When Mr. Krivoruchko failed to close on the property, (*Pl.St.*, ¶¶ 13-17),  Ner Tamid put it back on the market and listed it at $3.8 million.  (*Pl.St.*, ¶ 34).  The property has been continuously on the market at that price, and no offers have been received.  Nonetheless, Mr. Krivoruchko argues that Ner Tamid's failure to have negotiated with the earlier offeror precludes it from "establish[ing] that it has been damaged by the failure to sell  the property at the contractual price when it has not offered to sell the property at that contractual price to any other party before or since." (*Response to Plaintiff's Motion for Summary Judgment*, at 7).  But mitigation does not require an injured party to take a 48% loss on a contract.[6]  That would not be reasonable.  Moreover, Mr. Krivoruchko offers no proof that the property could have been sold at that price, and the proof suggests the contrary since no one has made any offer on the property since it went back on the market in May 2008.

---

[6] Acceptance of a $2 million offer would result in a loss of $1,825,000, which is 48% of the contract price of $3,825,000.

The standard measure of damages in a purchaser's action for breach of a contract to convey land is the difference between the fair market value of the property and the contract price. *O'Neil v. Continental Bank, N.A.*, 278 Ill.App.3d 327, 342, 662 N.E.2d 489, 499 (1st Dist. 1996). This is not to decide what the measure of damages should be here. That question will be determined separately in pretrial briefing. But whatever the appropriate measure of damages, the $2 million offer might be admissible on the question of the fair market value, although it was made three or four months after Mr. Krivoruchko's breach. *See City of Chicago v. Lehmann*, 262 Ill. 468, 473-474, 104 N.E. 829 (1914); *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 792 (2nd Dist. 2008)(evidence as to fair market value too far removed from date of breach where expert based opinion on data seven years after breach). *Cf. Lakshman v. Vecchione*, 102 Ill.App.3d 629, 635, 430 N.E.2d 199, 203 (1st Dist. 1981)("The resale price, if within a reasonable time and at the highest price obtainable after the breach, is evidence of the market value on the date of the breach."). *But see Sharp v. United States*, 191 U.S. 341, 348 (1903)(offers to purchase property inadmissible to show fair market value).

Of course, the appraisers each party has obtained will no doubt testify at trial. But there may be other evidence relevant to the question of damages. *See Pelz v. Streator Nat. Bank*, 145 Ill.App.3d 946, 956, 496 N.E.2d 315, 323 (3rd Dist. 1986)(difference between contract price and fair market value only one element of damages); *Sheppard v. Fagan*, 94 Ill.App.3d 290, 292, 418 N.E.2d 876, 879 (1st Dist. 1981)(same). Perhaps even Ner Tamid can offer an opinion as to the value of its property. *See Hill v. Ben Franklin Sav. & Loan Ass'n*, 177 Ill.App.3d 51, 56, 531 N.E.2d 1089, 1093 (2nd Dist. 1988). But these are all questions to be resolved at trial. For now it is enough to say that the issue of damages cannot be resolved on the Motion for Summary Judgment.

The fact that Mr. Krivoruchko's appraiser opines that the market value of the property has

not diminished at all since Mr. Krivoruchko breached the contract – a curious assessment given Mr.

Krivoruchko's insistence that the commercial real estate market has crashed – does not mean, as Mr.

Krivoruchko contends, that he is not liable for breach of contract. Even if it were ultimately proved

at trial that there was no difference between the contract price and the fair market value at the time

of the breach – if that were the appropriate date on which value was to be assessed – Mr.

Krivoruchko is still liable for breach of contract and for at least nominal damages and whatever other

damages may be proven, including perhaps the value of Ner Tamid's use of the money expected

from the sale. *See Phillips v. Feldott*, 1997 WL 587658, *2 (N.D.Ill. Sept. 17, 1997).

### C.

### Mr. Krivoruchko's Claims of Impossibility and Impracticability

### 1.

The second affirmative defense, impossibility or impracticability of performance, is a defense

to liability, as the Illinois Supreme Court recognized in *Leonard v. Autocar Sales & Service Co.*, 392

Ill. 182, 64 N.E.2d 477 (1945), *cert. denied* 327 U.S. 804 (1946):

> . . . [I]n contracts to whose performance the continued existence of a particular
> person or thing is necessary, a condition is always implied that the death or
> destruction of that person or thing shall excuse performance. . . . The reason given
> for this exception, which is itself a rule, is that without any express stipulation that
> the destruction of the person or thing shall excuse the performance, that excuse is by
> law implied, because from the nature of the contract it is apparent that the parties
> contracted on the basis of the continued existence of the particular person or thing.

392 Ill. at 187, 64 N.E.2d at 479. This is the doctrine of impossibility in the strictest sense. It would

apply where the subject matter of the contract – say a building – was destroyed. *See Mouhelis v.*

*Thomas*, 95 Ill.App.3d 181, 183, 419 N.E.2d 956, 958 (2nd Dist. 1981). It obviously is inapplicable

here. But *Leonard* also allowed for "frustration" of purpose as an extension of the exception, saying

16

it applied:

> to cases where the cessation or nonexistence of some particular condition or state of
> things has rendered performance impossible and the object of the contract frustrated.
> It rests on the view that where from the nature of the contract and the surrounding
> circumstances the parties when entering into the contract must have known that it
> could not be preformed unless some particular condition or state of things would
> continue to exist, the parties must be deemed, when entering into the contract, to
> have made their bargain on the footing that such particular condition or state of
> things would continue to exist, and the contract therefore must be construed as
> subject to an implied condition that the parties shall be excused in case performance
> becomes impossible from such condition or state of things ceasing to exist.

392 Ill. at 188, 64 N.E.2d at 480.

It is Mr. Krivoruchko's contention that the "*depth* of the real estate recession that began in

mid-2007" was neither foreseen by him, nor was it "foreseeable." (*Response to Plaintiff's Motion*

*for Summary Judgment*, at 4; *id.*, Ex A at ¶11, Lawrence Affidavit; Ex. B at ¶5, Krivoruchko

Affidavit)(Emphasis supplied). Hence, he says, his nonperformance under the contract is excusable.

There are several flaws in the argument. The first is that the claim of unforeseeability is based on

the wholly conclusory statement in his affidavit and that of his banker – neither of which is

supported by a single fact – and thus is insufficient to defeat summary judgment. *See F.T.C. v. Bay*

*Area Business Council, In*c. 423 F.3d 627, 634 (7th Cir. 2005).[7]  Similarly, to the extent the

conclusion of unforeseeability is intended tacitly to suggest that prior to May 2007, when the contract

was entered into, there was no forewarning of significant dislocations in the economy or the real

estate market, it is not only unsupported by any facts, it is contrary to the evidence.

---

[7] The rule applies to experts as well as non-expert witnesses and parties. *Weigel v. Target Stores,*
122 F.3d 461, 468-469 (7th Cir.1997)("'The fact that a party opposing summary judgment has some
admissible evidence does not preclude summary judgment. We and other courts have so held with
specific reference to an expert's conclusional statements.'"); *Thomas v. Christ Hosp. and Medical
Center,* 328 F.3d 890, 894 (7th Cir. 2003).

Long before Mr. Krivoruchko contracted to buy the Ner Tamid property in May 2007, there were predictions from informed and responsible sources that dislocations in the subprime mortgage market could have profound effects on the national economy. A number of articles in 2005 are adverted to in Judge Posner's, "A Failure of Capitalism," 118-119 (Harvard. Univ. Press 2009):

> But when the rise in housing prices began to show signs of slowing in 2005 after having risen more than 60 percent since 2000, talk about a housing bubble in the general media – the financial journals, as we know, had been far ahead – started in earnest. Newspaper articles featured such headlines as "Housing Bubble Is Real, So Don't Get Hurt When It Finally Pops," "If Housing Bubble Pops, Look Out!," "Hear a Pop? Watch Out," "Economists: Housing Boom Could Lead to Busts," "Four Out of 10 Americans Fear Real-Estate Bubble," "Efforts to Regulate Risky Mortgage Innovations Are So Far Ignored," and "Risky Lending Spurs 'Bubble.'" There was an especially prescient editorial entitled "Risky Mortgage Business" in the *New York Times* of July 6, 2005. . . .The alarm bells were sounded even more loudly in 2006, 2007 and in the first six months of 2008.

An article in the August 27, 2006 New York Times noted that while a real estate crash might not be the most likely outcome of the subprime mortgage debacle, "the latest housing numbers seem likely they could be a turning point," and "it certainly seems legitimate to think about what [a real estate crash] would look like." The article noted that while most economists on Wall Street were predicting a soft landing, a "crash is the outcome that a small group of analysts say is the only possible ending for the biggest housing boom of all." As to whether the events in the housing market were a brief pause or a brief correction, the Chief Economist at MoodysEconomy.com said, "either argument is very compelling. I can debate myself on it. That's why there's a great deal of uncertainty." The article pointed out that the housing slowdown "has begun damaging the job market. Builders, mortgage lenders, and real estate agencies have stopped adding to payrolls." The potential impact on the broader economy was of concern since "the real estate sector has accounted for 44 percent of jobs created since 2000 and employs more than one in 10 American workers...."

http://www.nytimes.com/2006/08/27/weekinreview/27leonhardt.html.

Paul Krugman's August 25, 2006 article in the New York Times, "Housing Gets Ugly,"
explained the trouble brewing for Toll Brothers, which announced that sales and profits were
substantially down and that the company was walking away from already-purchased options on land
for future development. The article said that Toll's announcement "was one of the many indications
that the long-feared housing bust has arrived." It went on to discuss varying metrics, all of which
portended disaster. Mr. Toll was quoted as saying that the current downturn was unlike anything he
had ever seen. The article said that while the majority of business economists were predicting a soft
landing for housing, "this complacency looks increasingly like denial, as hard data... start to confirm
anecdotal evidence that it is, indeed, a bust."

The article concluded by saying that if the housing bubble were to burst on a nationwide
basis, the picture would be "ugly... and not just for people and companies in the construction
business." Many homeowners would find themselves in financial distress, "[a]nd the economy as
a whole will take a hit." While noting that most forecasters remained optimistic, "Nouriel Roubini
of Roubini Global Economics," a noted economist and a professor of economics at NYU, was "flatly
predicting a housing-led recession in the coming year." http://select.nytimes.com/2006/08/25/
opinion/25krugman.html.

In September 2006, Barron's was forecasting unprecedented disaster for the subprime
mortgage market, and an article in USA Today on March 19, 2007 discussed the "huge spillover
effect into other sections of the financial world" that could come from the problems in the subprime
mortgage market. The article concluded that the Chief Economist for Moody's Investor Service
calculated the likelihood that the subprime mortgage market's woes would throw the economy into

a recession at 20%. The article said that while those were "fairly long odds," they were "not insignificant." http://www.usatoday.com/money/perfi/columnist/waggon/2007-03-15-subprime-woes_N.htm.

In December 2006, Steven Pearlstein wrote an article in the Washington Post that referred to a Wall Street Journal piece reporting about the subprime market crisis. Pearlstein's article said that those who expressed surprise at how fast the situation was unraveling "ain't seen nothin yet." "But enough hand-wringing over the residential real-estate market. Not much anyone can do about that now. The new story is the bubble in the commercial real estate market – offices, hotels, and retail establishments – which has generated spectacular returns for investors over the past few years." While the author acknowledged that it was possible that those who were minimizing the problem were right, he doubted it and went on to predict that "at some point this commercial real estate bubble will burst. The cause may be a sharp decline in the dollar that scares away foreign investors. Or an unexpected spike in interest rates. Or a recession." The article concluded that exactly how this would all unfold was uncertain. But it predicted that some time in the next two years, the bubble would burst and "everyone will look back and wonder why anyone could have doubted there was a bubble – why credit-rating agencies didn't warn of the risks, and why bank and securities regulators didn't step in." http://www.washingtonpost.com/wp-dyn/content/article/2006/12/05/AR2006120501453.html.

Wharton Real Estate Professor, Susan Wachter, in an article on February 21, 2007, entitled, "Could Tremors in the Subprime Market Be The First Signs of an Earthquake?", sounded the alarm. She expressed the gravest concern for the future of the economy: "We could potentially have a housing-led recession" beginning in the second half of 2007 or sometime in 2008, she said. Of

course, others, including colleagues of Professor Wachter's, had a different view, and thought "the U.S. economy could well dodge this bullet." The article went on to examine in detail the various factors in the subprime market that could affect the broader economy. http://knowledge.wharton.upenn.edu/article.cfm?articleid=1664. Professor Wachter was also quoted in a December 5, 2006 article in the New York Times. http://www.nytimes.com/2006/12/06/business/06mortgage.html.

The above is a small sampling of the articles that were in the public domain months before Mr. Krivoruchko began dealing with Ner Tamid.[8] Whether he–or his banker-- saw these or other articles or publications is inconsequential. The point is that Mr. Krivoruchko's contention that the situation he claims was "unforeseeable"in the Summer of 2007 had in fact been the subject of public debate in 2005, 2006 and early 2007. As the Illinois Supreme Court in *Leonard* cautioned, if the event at issue might have been anticipated or guarded against in the contract, the parties shall be held to any unqualified undertaking in the contract. *Id.,* at 189.

Of course, unforeseeability is a question of degree. "Any kind of impossibility is more or less capable of anticipation. The question is one of degree, and if anticipated, any circumstance whatever may be guarded against by the draftsman of the contract." 18 Williston on Contracts, § 1953, at 117-18. Learned Hand put it this way: "A promise still involves risks that the promisor may find burdensome or even impossible to meet. Its very purpose is to give assurance to the

---

[8] Rule 201, Federal Rules of Evidence, permits a court to take judicial notice of these articles. The articles do not violate the hearsay rule since they are not offered for the truth of the opinions expressed in them, but rather to show that there was a public debate about the risks of a recession and the potential toxic consequences to the economy resulting from the subprime mortgage market crisis and other events. *See Young v. County of Cook,* _F.Supp.2d_, 2009 WL 971675 at *8 (N.D.Ill. 2009); *O'Sullivan v City of Chicago*, 2007 WL 671040 at *12 (N.D.Ill. 2007).

promisee against the hazards of the future. The promisor, by undertaking these *pro tanto* relieves the promisee, and it is in the end a question of how unexpected at the time was the event which prevented performance." *Companhia De Navegacao Lloyd Brasileiro v. C.G. Blake Co.*, 34 F.2d 616, 619 (2nd Cir.1929). The risk of an economic downturn may have been uncertain, but it was not unforeseeable, as that turn is used in the cases dealing with supervening impracticability. Mr. Krivoruchko's contrary contention consists solely of his banker's unsupported and unexplained conclusion (*Lawrence Affidavit*, Ex. A at ¶11 ) and conclusory statements Mr. Krivoruchko claims were made to him by unidentified "lenders" that the "primary driver of [the] decline in loan acceptance was the market, not the individual credit-worthiness of the applicants." (*Krivoruchko Affidavit*, ¶4). Apart from being impermissibly conclusory, these statements are inadmissible hearsay. *Morrow v. Wal-Mart Stores, Inc.,* 152 F.3d 559, 563 (7th Cir.1998); Rules 801(c) and 802, Federal Rules of Evidence.

**2.**

But let us assume that the situation in the summer of 2007 was an acute event; Mr. Krivoruchko's argument is nonetheless analytically incorrect. The question is not whether the "depth of the recession" was foreseeable, but rather, it is whether it was foreseeable that a lender might not provide him with financing in connection with the purchase of the Ner Tamid property. The foreseeability of that event is beyond debate. Whether a lender will make a desired loan in a particular deal is never certain. Financing can be denied for any number of reasons. Creditworthiness is simply one factor to be considered, as Mr. Krivoruchko's own proof shows. If creditworthiness – and it may be noted that the term is never explained in Mr. Krivoruchko's summary judgment submissions – was a self-sufficing factor, the First DuPage Bank would not have

ceased making commercial real estate loans "as a matter of practice," in 2007, and its loan committee would not have issued "an edict in February 2008 not to even consider commercial real estate development loans of the type being pursued by Mr. Krivoruchko and others." (*Krivoruchko's Local Rule 56.1 Statement and Response to Plaintiff's Rule 56 Statement*, Ex. A ¶¶5-11).

In addition to creditworthiness and prevailing economic conditions, financing decisions obviously will depend upon the inherent merit of the proposed transaction. A "loan committee" like that at First DuPage Bank, (Lawrence Aff., ¶7) might not like a particular deal or may have decided to allocate its funds in a way that made a particular form of financing unavailable to the lender. Underwriting guidelines might also impel a lender not to grant financing in a particular instance and a change in bank ownership or in lending officers might result in a denial of financing. Finally, creditworthiness sufficient for one size or kind of deal may not be sufficient for another size or kind of transaction. *Semper ubique et ab omnibus* is not a maxim of careful lenders.

It is precisely because inability to obtain financing is a foreseeable (and significant) risk that can be readily guarded against in the parties' agreement that financing contingency provisions are common in both commercial and residential real estate contracts. *See e.g., Fabriko Acquisition Corporation v. Prokos,* 536 F.3d 605, 607 (7th Cir. 2008); *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 383 Ill.App.3d 645, 671, 891 N.E.2d 1, 27 (1st Dist. 2007); *State Farm General Ins. Co. v. Stewart* 288 Ill.App.3d 678, 681, 681 N.E.2d 625, 627 (1st Dist. 1997); *Aviation Development Co. PLC v. C&S Acquisition Corp.,* 1999 WL 46630, 12 (S.D.N.Y. 1999); *Lipton v. Cleveland,* 1996 WL 571455, 1 (Conn.Super.1996). But they are by no means exclusive, and there are any number of reasons why a party may choose to pay cash. *See e.g., Steinberg v. Linzer,* 2002 WL 221104 at

\* 1 (N.Y.Sup. 2002); *Stevens v. Manchester,* 128 Ohio App.3d 305, 308, 714 N.E.2d 956, 958 (Ohio App. 1998). *See also infra* at 27.

Sophisticated commercial parties like Mr. Krivoruchko are free to contract as they desire, subject to the constraints of local or federal law. *United States v. Eurodif S.A.*, _U.S._, 129 S.Ct. 878, 887 (2009); *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1090 (3rd Cir. 1988). It is not for a court paternalistically to rewrite a party's agreement to include terms that they chose not to make a part of their agreement, *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 311-312 (1942); *Hoosier Energy Rural Electric Co-opinion, Inc. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1317 (7th Cir. 1994); *Gore v. Indiana Insurance Co.,* 376 Ill.App.3d 282, 288, 876 N.E.2d 156, 163 (1st Dist. 2007), and there is a strong presumption against provisions that easily could have been included in the contract but were not. *Cress v. Recreation Services*, 341 Ill.App.3d 149, 185, 795 N.E.2d 817, 851 (2nd Dist. 2003).

For Mr. Krivoruchko to prevail, he must show that the availability of financing was "a basic assumption on which the contract was made," that he did not assume the risk of its non-occurrence, that he can operate only at a loss if required to perform, Restatement (Second) of Contracts, §261, and that the loss will be "so severe and unreasonable that failure to excuse performance would result in grave injustice." *Northern Illinois Gas Co. v. Energy Co-op, Inc.*, 122 Ill.App.3d 940, 956, 461 N.E.2d 1049, 1061 (3rd Dist. 1984).[9] The evidence demonstrates that financing was not an

---

[9] Section 261 of the Restatement, Discharge By Supervening Impracticability, provides:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

assumption underlying the contract at all, let alone a basic assumption. Indeed, Mr. Krivoruchko does not even claim that the matter of financing was ever discussed with Ner Tamid prior to the contract being executed in May 2007, and by choosing not to include a financing clause in the agreement, Mr. Krivoruchko signaled to Ner Tamid that financing was irrelevant to the transaction. Thus, it is not surprising that "[h]ow [Mr. Krivoruchko] was to raise the funds for the [ ]purchase was of no importance to [Ner Tamid]." *Gerald Elbin, Inc. v. Seegren,* 62 Ill.App.3d 20, 24, 378 N.E.2d 626, 629 (2nd Dist. 1978).

Mr. Krivoruchko may have been proceeding on the assumption that financing was the *sine qua non* of the deal, but he never conveyed that to Ner Tamid, and "private intent counts only if it is conveyed to the other party and shared." *Robbins v. Lynch,* 836 F.2d 330 (7th Cir.1988). *See also Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 330-331, 371 N.E.2d 634 (1977); *American College of Surgeons v. Lumbermens Mutual Casualty Co.,* 142 Ill.App.3d 680, 693-694, 491 N.E.2d 1179 (1986)( secret, undisclosed mental reservation on the part of one party to a contract cannot be considered).[10]

In short, the record shows conclusively that Mr. Krivoruchko simply guessed wrong in assuming that financing would not be a problem. His heads I win, tails you lose approach finds no support in the doctrine of supervening impracticability, and he cannot now insist that Ner Tamid bear the burden of his miscalculation. If Mr. Krivoruchko's argument were accepted, no real estate

---

[10] *See also 7200 Scottsdale Road General Partners v. Kuhn Farm Machinery, Inc.,* 184 Ariz. 341, 909 P.2d 408 (Ct. App.1995) (even if foreign participants were precluded from attending a convention due to the risk posed by terrorism to international air travel, the organizer's obligation to pay for reserved facilities was not excused, since the resort did not share the understanding that the contract's principal purpose was for a convention where the attendance of foreign participants was essential); *Felt v. McCarthy,* 130 Wash. 2d 203, 922 P.2d 90 (1996) (seller did not share purchaser's assumption that the land could be successfully developed as an office park).

25

sales contract need have a financing contingency clause, since it would it would be a basic

assumption on which every real estate contract was based and thus an implied term in every

agreement.  No case suggests that result, and the Illinois courts have flatly rejected it.  *See Gerald*

*Elbin, Inc.,* 62 Ill.App.3d at 24, 378 N.E.2d at 629.

> The instant case fits comfortably within the rule that:

> One who contracts to render a performance or to produce a result for which it is
> necessary to obtain the cooperation of third persons is not excused by the fact that
> they will not cooperate ....

> \* \* \*

> If the promised performance can not be rendered without performance by the third
> party the promisor must take sufficient pains to induce such performance. The risk
> is his; the case is merely one of unexpected difficulty or expense.  6 A. Corbin,
> Contracts § 1340, at 405, 407 (1950).  *See also* Annot. 84 A.L.R.2d 12, 31 (1962).
> *See also*; 6 Williston, Contracts § 1932 (Rev'd ed.).  Recalcitrance on the part of
> local, state, and federal authorities to advance funds or assume debts cannot be
> held a legally effective excuse for the Town's default. This is not a case where a
> supervening rule or regulation of the government objectively renders performance
> impossible and thus releases the Town from liability.

*Dworman v. Mayor and Bd. of Aldermen, Governing Body of Town of Morristown,* 370 F.Supp.

1056, 1070 -1071 (D.N.J. 1974).

> The rule has also been applied in cases in which a party has sought to escape liability under

its contract on the ground that an external and truly unanticipated event affected the financing of a

real estate transaction.  Thus, in *Hubbard v. Talbott Tavern, Inc.*, 2006 WL 2089308, at \*3 - 4

(Ky.App. 2006), the Kentucky Court of Appeals rejected application of the doctrine of impossibility

when buyers were unable to close on the property after their financial backers withdrew in the wake

of the events of September 11, 2001:

> In this case, the subject matter of the contract was not directly affected by the

unfortunate events of September 11, 2001. The impossibility of performance alleged as a defense by appellants looks to the performance of third parties, that being the investors who apparently were financing the transaction for appellants. In Raisor, our highest Court has specifically addressed circumstances surrounding the actions of third parties regarding the impossibility of performance of a contract as follows:

[T]he inability to control the actions of a third person, whose co-operation is needed for the performance of an undertaking, is ordinarily not to be regarded as an impossibility avoiding the obligation. One who engages for the act of a stranger must procure the act to be done, and the refusal of the stranger without the interference of the other party to the contract is no excuse. The performance of an absolute promise is not excused by the fact that a third person refuses or fails to take action essential to performance.

The refusal of the investors to go forward with the transaction on behalf of appellants did not render appellants' performance of the contract impossible to achieve. Two obvious factors that defeat appellants' argument stand out. First, we note that the performance of the contract was not expressly conditioned upon appellants obtaining financing from a specific investor. The contract makes no mention of any third party financing requirement or condition. Second, there is absolutely no evidence in the record that the investors were disabled or otherwise unable to perform as a result of the events of September 11, 2001, other than the investors being scared as alleged by appellants.

\* \* \*

Finally, in review of the contract between the parties, we note that there is no force majeure clause. This type of clause is traditionally used in contracts to allocate the risks between the parties if performance becomes impossible or impractical as a result of some event that the parties did not anticipate or otherwise could not have controlled. forth in the agreement, there exists no legal basis.

In *DiScipio v. Sullivan,* 30 A.D.3d 660, 661, 816 N.Y.S.2d 576, 577 - 578 (2006), the court

granted summary judgment to the plaintiff notwithstanding the defendant's contention that he failed

to close on a real estate purchase contract because of "inability to obtain financing." As in the instant

case, there was no mortgage contingency clause. *See also Beth Equities v. Silgo Greenwich*

*Associates,* 223 A.D.2d 367, 636 N.Y.S.2d 309 (1996)("reluctance of lender" not a basis to exclude

performance where there was no financing contingency clause in the contract); *Butzke v. Beach*

*Homes, Inc.,* 1984 WL 159380, 2 (Del.Ch.1984)("If there had been no financing contingency clauses

then the buyers would have been absolutely bound to have completed the purchase of the property at the inception of the contract.").

**3.**

A further flaw in Mr. Krivoruchko's impossibility/impracticability defense is that he has not shown that performance of the contract would have resulted in any loss, let alone one "so severe and unreasonable that failure to excuse performance would result in grave injustice." *Northern Illinois Gas Co.,* 122 Ill.App.3d at 956, 461 N.E.2d at1061. He merely argues that without the *precise* kind of financing he sought, from the limited sources from which he sought it, he was unable to go forward with the contract. He has, however, offered no evidence that he does not have the financial wherewithal to buy the property with his own funds. For all we know, he is Donald Trump in miniature. He is, after all, part-owner of the real estate development company, Dolce Living Homes, LLC, which operates in Illinois, Texas, Florida, and Mississippi. www.dolceliving.com. The company boasts of having developed over 200,000 square feet of commercial real estate, as well as more than 1500 multifamily residential buildings. It is currently marketing condominium units in five developments in Chicago, with prices beginning in the $200,000 range. Units in two Texas developments sell for $1 million. According to Mr. Krivoruchko's attorney, he "closed over 250 units" – presumably condominium units – during the twelve months ending October 2007. (*Pl.St.*, Ex. D).

So, while closing might have required Mr. Krivoruchko to use some or all of his own funds, Mr. Krivoruchko has not shown that closing was either impossible or impracticable. "The mere fact that the contract had become unexpectedly burdensome is seldom, if ever, enough" to excuse

performance. *C.G. Blake Co.*, 34 F.2d at 619. *See also Columbus Ry., Power & Light Co. v. City of Columbus, Ohio*, 249 U.S. 399, 414 (1919)("But equity does not relieve from hard bargains simply because they are such."). Judge Posner has made the same point:

> The doctrines [of impossibility and impracticability] do not allow a promisor to be discharged merely on the ground that the expense of performance has increased since the contract was signed. Of course not. That would undermine a fundamental purpose of contracts, which is to assign the risk of unforeseen events – and normally the risk of an unforeseen increase in the costs of performance is assigned to the performing party, who is assumed to be more knowledgeable about this risk, as well as to have superior ability to prevent it from occurring.

*Commonwealth Edison Co. v. Allied-General Nuclear Services*, 731 F.Supp. 850, 861 (N.D.Ill. 1990). *See also Giannini v. First Nat. Bank of Des Plaines*, 136 Ill.App.3d 971, 982-983, 483 N.E.2d 924 (1st Dist. 1985)("Thus the fact that the contract cannot be performed without great or unanticipated expense is not such an impossibility that will usually excuse performance."); *Joseph W. O'Brien Co. v. Highland Lake Construction Co.,* 17 Ill.App.3d 237, 240, 307 N.E.2d 761 (1974)(rejecting argument that performance was rendered impracticable because of extreme and unreasonable difficulty and unanticipated expense).[11]

The cases Mr. Krivoruchko relies upon for the proposition that he should be relieved of his duty to perform because of unanticipated expense that make performance, to use his words, "massively more expensive" (*Response* at 8) are far removed from the circumstances here. In

---

[11] The rule against judicial revision of contracts to shift a risk that the parties easily could have provided for in their contract has been utilized even in times of war or unusual trade conditions where the price of goods or transportation has risen abnormally, and the defendant could not perform its contract without greater expense than anticipated. In that context, the enhanced expense is not such an impossibility as will excuse performance. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1295 (Fed. Cir.2002)(Seaboard bet incorrectly that the timber market would remain strong.); *Megan v. Updike Grain Corp.*, 94 F.2d 551, 554 (8th Cir. 1938).

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 277 (4th Cir. 1987), the plaintiff sought damages for the breach of a contract it had with defendant for the removal and disposal of spent nuclear fuel. At the time of the contract, the government had a program for the reprocessing of spent nuclear fuel. It was discontinued after the contract was signed. What had been an anticipated profit for the defendant of $20 million turned into a potential loss of $80 million when expensive storage became the only remaining option. The court found the application of the impossibility doctrine justified where "use of the alternative not only wiped out the expected profit but resulted in a loss some four or five times greater than the expected profit....." *Id.* at 277.

That massive turnaround from the outcome expected when the contract was executed is not remotely comparable to the circumstances here. If Mr. Krivoruchko had proceeded with the closing, he would have been required to pay $3.8 million. Had he accepted the partial financing deal he found objectionable, he would have only had to come up with $1.74 million. In either event, he would have had a piece of property with substantial value. Indeed, his appraiser says that the land is still worth $3.8 million, and there is absolutely no claim or proof that had the deal gone forward, Mr. Krivoruchko would have suffered any loss. This is a far cry from the situation presented in *Florida Power & Light Co.,* where the defendant faced staggering losses of $80 million had its performance not been excused.

The moratorium on nuclear fuel reprocessing also was involved in the decision in *Commonwealth Edison, supra,* where Judge Posner, sitting by designation, held that the change in the nuclear regulatory laws fell within the *force majeure* provision in the parties' agreement for nuclear fuel reprocessing. Significantly, the defendant there chose to include a clause covering the possibility – remote though it was – that it might not be able to obtain a waste disposal license. 731

F. Supp. at 855-56. It turned out to be fortuitous for the defendant, but it was not inserted into the agreement with a possible moratorium on fuel reprocessing in mind. At the time, the defendant's reprocessing facility was not yet licensed. The plaintiff demanded language to assure it that the defendant would not drag its feet on licensing; the defendant insisted on a clause that would relieve it of the duty to perform if the government simply denied the license. 731 F. Supp. at 853, 855. A cautionary tale for Mr. Krivoruchko about neglecting to have a financing contingency clause, but not support for his position.

The two other cases Mr. Krivoruchko cites are similarly unhelpful. In *Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div.*, 775 F.2d 781 (7th Cir. 1985), a Uniform Commercial Code case, the doctrine of impracticability applied where parties contracted for production of waste water equipment, not foreseeing that the third party engineering firm providing specifications that only one manufacturer could comply with; *i.e.*, the specifications guaranteed that only the engineer's preferred manufacturer could comply, and that the contracting party could not. *Id.*, at 786. Added expense was not the issue, true impossibility was. And in *Twin City Fire Ins. Co. v. Philadelphia Life Ins. Co.*, 795 F.2d 1417, 1428 (9th Cir. 1986), the parties contracted under the assumption that a specific annuity from a specific insurance company was available in Oregon. Because it was not, the court found that there might be genuine issues of fact as to whether the doctrine of impracticability applied (the lower court had not accepted evidence on the point). Here, the assumption on which the parties were objectively proceeding was that with or without financing, Mr. Krivoruchko was going to buy the property.

In the end, there is nothing to support Mr. Krivoruchko's plea that he be discharged from performing under his contract with Ner Tamid. He has presented no evidence that the indisputable

economic difficulties in the Summer of 2007 were "unforeseeable," as that term is used in the law of contracts; he has presented no evidence that financing was "a basic assumption" on which the contract was based; he has presented no evidence as to any inability to have funded the transaction without financing; he has presented no evidence as to any loss that he might have incurred had he closed the deal without the financing; and he has presented no evidence regarding any undue economic burden that he would have borne had the deal closed without financing. Consequently, he has failed to carry his burden of showing that there is a disputed issue of material fact on his affirmative defenses, and Ner Tamid, having demonstrated that there is no disputed issue of material fact on the question of Mr. Krivoruchko's breach of contract, is entitled to partial summary judgment on liability.

4.

But there is more. Another requirement of the impossibility/impracticability defense is the defendant must demonstrate that he has tried all practical, available alternatives to permit performance. *Illinois-American Water Co. v. City of Peoria*, 332 Ill.App.3d 1098, 1106, 774 N.E.2d 383, 391 (3rd Dist. 2002); *Blue Cross Blue Shield of Tennessee v. BCS Ins. Co.*, 517 F.Supp.2d 1050, 1056 (N.D.Ill. 2007). Mr. Krivoruchko's evidence on this point it is sorely wanting. The alternative of using his own money has already been discussed. As for financing, Mr. Krivoruchko sought one type of financing package at one bank – First DuPage – and was turned down. Mr. Krivoruchko's attorney wrote on October 23, 2007, that Mr. Krivoruchko was *not unable* to secure financing, it was just that the particular kind he wanted took a little time. (*Pl.St.*, ¶ 31; Ex. D). The affidavit from Mr. Lawrence is quite specific on this point. Mr. Lawrence said that bankers at First DuPage were given "an edict in February 2008 not to even consider commercial real estate development loans *of the type*

32

*being pursued by Mr. Krivoruchko and others."* (*Krivoruchko's Local Rule 56.1(b)(3)(A) and (B) Response*; Ex. A, ¶ 7 (Emphasis supplied)). At least one other bank offered him a different kind of package – one that required he use some of his own funds – but he rejected it.

There is nothing in the record that shows that Mr. Krivoruchko sought other types of financing packages from other banks. Nor is there anything that demonstrates that the precise kind of financing package he requested from the First DuPage Bank was the only one amenable to the project under consideration or that other banks would not have been receptive to Mr. Krivoruchko's loan application. Yet without that evidence, Mr. Krivoruchko has not carried his burden of demonstrating that he exhausted all practical, available alternatives to obtain the financing he says was the basic assumption on which the contract was based.

Mr. Krivoruchko's affidavit states that he became increasingly aware that other banks at which he had applied and the lending market in general had begun to reject loans that would previously have been accepted. (¶4). These statements are unexplained and necessarily are based on inadmissible hearsay, as is the concluding statement of paragraph 4 of the affidavit: "I was told by the lenders during this period of time that the primary driver of this decline in loan acceptance was the market not the creditworthiness of the applicants and that such rejections increased to the point that essentially all such loans were rejected as a matter of practice." This is not sufficient to demonstrate that Mr. Krivoruchko sought financing from other banks and that none was available.

## CONCLUSION

The soundness of a conclusion may not infrequently be tested by its consequences. *See* Posner, Cardozo: A Study in Reputation, 118 (1990); *Florida Power & Light Co. v. United States*

*Nuclear Regulatory Commission*, 470 U.S. 729, 741 (1985); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 2831 (2007)(Breyer, J., dissenting). The consequences of Mr. Krivoruchko's mitigation theory, if accepted, would provide an incentive for a party who had not included a financing contingency clause in a contract to repudiate the contract if he did not obtain the specific financing he desired and then insist that the seller agree to terms favorable to him. If the seller balked, he would have failed to mitigate his damages, and there would be a *pro tanto* reduction in the amount of damages that could be recovered. The certainty and predictability that written contracts seek to ensure, *Blue Cross and Blue Shield Assn. v. American Express Co.*, 467 F.3d 634, 640 (7th Cir. 2006); *In re Comdisco, Inc.*, 434 F.3d 963, 968 (7th Cir. 2006); *ConFold Pacific, Inc. v. Polaris Ind.*, 433 F.3d 952, 955 (7th Cir. 2006); *In re Kmart Corp,* 434 F.3d 536, 541 (7th Cir. 2006), would vanish.

Courts' historic refusal to rewrite contracts to accord with some ill-defined notion of fairness acquired in the light of subsequent developments is deeply ingrained in judicial consciousness. The reasons are as sound as they are obvious. If judges were allowed to act as *post-hoc* revisory boards and to ignore the agreement of the parties in order to relieve one of them from a hard bargain, voluntarily and honestly made, there would be created "an insecurity in business transactions which would be intolerable." *Effinger v. Kenney,* 115 U.S. 566, 572 (1885). "As Justice Brandeis recognized, '[p]unctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors.'" *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). *See also Farrington v. State of Tennessee,* 95 U.S. 679, 682 (1877).[12] "While we recognize

---

[12] "A compact lies at the foundation of all national life. Contracts mark the progress of communities in civilization and prosperity. They guard, as far as is possible, against the fluctuations of human affairs.
(continued...)

that a rule of strict compliance might lead to harsh results, such a rule tends to 'enforce [ ] commercial certainty.'" *Thomson Learning, Inc. v. Olympia Properties, LLC,* 365 Ill.App.3d 621, 631, 850 N.E.2d 314, 323 (2nd Dist.2006).

Mr. Krivoruchko's claims of impossibility and supervening impracticability are inconsistent with these core values and do not satisfy the basic requirements of the doctrines on which they are based. The plaintiff's motion for partial summary judgment [# 47] is GRANTED. The question of damages to which Ner Tamid is entitled will be decided at trial.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 7/9/09

---

12(...continued)
They seek to give stability to the present and certainty to the future. They gauge the confidence of man in the truthfulness and integrity of his fellow man. They are the springs of business, trade, and commerce. Without them, society could not go on." *Farrington*, 95 U.S. at 682.